Timothy M. Frank (California Bar No. 263245)
timothy.frank@hnbllc.com
HAGAN NOLL & BOYLE LLC
820 Gessner, Suite 940
Houston, Texas 77024
Telephone: (713) 343-0478
Facsimile: (713) 758-0146

Attorney for Plaintiffs DISH Network L.L.C.
and Sling TV L.L.C.

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISH NETWORK L.L.C. and SLING TV L.L.C., <br><br> Plaintiffs, <br><br> v. <br><br> VANEET SHARMA and ASTRO VASTU SOLUTIONS LLC, <br><br> Defendants. | Case No. _____ <br><br> **PLAINTIFFS' COMPLAINT** |

Plaintiffs DISH Network L.L.C. and Sling TV L.L.C. file this action against Defendants Vaneet Sharma and Astro Vastu Solutions LLC for violations of the anti-trafficking provisions of the Digital Millennium Copyright Act, 17 U.S.C. § 1201. Defendants provide and profit from the sale of an illicit streaming service known as Sharma IPTV that captures and retransmits Plaintiffs' television programming, without authorization, by circumventing Plaintiffs' security measures.

**PARTIES**

1. Plaintiff DISH Network L.L.C. ("DISH") is a Colorado limited liability company that has its principal place of business in Englewood, Colorado.

2. Plaintiff Sling TV L.L.C. ("Sling") is a Colorado limited liability company that has its principal place of business in Englewood, Colorado.

3. Defendant Vaneet Sharma ("Sharma") is an individual that resides at 4975 Camino Tassajara, Danville, California.

4. Defendant Astro Vastu Solutions LLC ("AVS") is a California limited liability company that has its principal place of business located at Sharma's home in Danville, California. Sharma is the CEO and sole member of AVS. Upon information and belief, Sharma makes the day-to-day decisions regarding the operation of AVS, which he uses to process payments in connection with the infringing service at issue.

## JURISDICTION & VENUE

5. The Court has subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs assert claims for violations of 17 U.S.C. § 1201.

6. Defendants are subject to personal jurisdiction in this Court pursuant to Fed. R. Civ. P. 4(k)(1)(A) because Defendants reside in California and, by their wrongful conduct identified herein, purposefully directed their conduct towards and purposefully availed themselves of the privileges of conducting business in California, causing injury to Plaintiffs in California.

7. Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants reside in this judicial district and a substantial part of the events giving rise to Plaintiffs' claims occurred in this judicial district.

## DIVISIONAL ASSIGNMENT

8. Assignment to the San Francisco or Oakland Division is proper because a substantial part of the events giving rise to Plaintiffs' claims occurred in Contra Costa County and Defendants reside in Contra Costa County.

## THE REBROADCASTING SCHEME

9. Plaintiffs provide television programming to several million authorized, fee-paying subscribers of their Sling TV and DISH Anywhere services by transmitting channels to them using the internet. Plaintiffs hold rights to transmit the channels pursuant to license agreements between DISH and programming providers. The programming aired on the channels is subject to copyright protections and Plaintiffs are authorized by the programming providers to protect them. Plaintiffs' channels, whether transmitted to Sling TV or DISH Anywhere subscribers, are delivered over the internet using the same Sling streaming platform ("Channels").

10. Plaintiffs implement digital rights management ("DRM") technology to protect the Channels from unauthorized access and copying. The DRM technology uses a key-based subscriber authentication and encryption-decryption process that makes Plaintiffs' Channels accessible to only authorized subscribers and prevents unauthorized access to and copying of the Channels.

11. Defendants are trafficking in an illicit internet streaming television service offered as Sharma IPTV (the "Service"). Defendants promote the Service by distributing flyers in Indian temples, restaurants, and shops, including in the Bay Area. The flyers direct users to contact Sharma by telephone or email to purchase the Service. Sharma processes payments received from his sale of the Service through his company AVS.

 

12. The Service is advertised on the flyer as a subscription-based service providing more than 10,000 live channels, sports programs, movies, and pay-per-view events, among other content, all for a low price ranging from approximately $10 to $15 per month. Users can access the Service with their own hardware or purchase a set-top box from Defendants for an extra fee. Defendants' advertising emphasizes attracting users that may otherwise purchase legitimate television services such as the satellite-based services that DISH offers, stating for example, "NO Cable/Dish Needed."

13. When purchasing the Service, Defendants provide users a portal URL to access the channels transmitted on the Service. Defendants activate and control access to the Service through the portal URL, as confirmed by Sharma's post-purchase statement: "Service started. All channels added." Defendants market themselves as "the most sought IPTV service provider" because "[o]ur

1  data centers are strategically located in Danville [where Defendants reside] and across the USA and
2  Canada to bring the live streaming without any delay or freeze."

3          14.     Plaintiffs' Channels are retransmitted without authorization to users that purchase
4  the Service from Defendants. Identifiers that are unique to Plaintiffs' internet transmissions of the
5  Channels were detected when conducting a technical analysis of the corresponding channels on the
6  Service, thereby confirming that channels retransmitted on the Service originated from Plaintiffs.
7  Sling's logo was also observed on certain channels retransmitted on the Service, further proof that
8  Plaintiffs' Channels were used to seed the Service with this unauthorized content.



*NFL RedZone from Sling*　　　　　　　　　　*NFL Redzone 4K from the Service*

        15.     Plaintiffs' Channels are retransmitted to users of the Service by circumventing the
DRM technology that Plaintiffs use to protect the Channels from unauthorized access and copying.
Upon information and belief, the circumvention targets at least the Widevine DRM. The Widevine
DRM controls access to Plaintiffs' Channels by requiring Plaintiffs' subscriber to present a valid
digital authentication key and license request to Sling's Widevine DRM server to obtain the channel
decryption key necessary to unlock a particular Channel. The channel decryption key is provided
to Plaintiffs' subscriber in an encrypted communication and upon receipt is not exposed to the
subscriber but rather is secured in the content decryption module of the subscriber's Widevine
supported device. In addition, the Widevine DRM protects against copying of Plaintiffs' Channels
by requiring that the encrypted audio-visual segments that make up a Channel are unlocked using
the channel decryption key and complied to form the Channel within the confines of the content

1  decryption module, such that Plaintiffs' subscriber can only view the Channel and not retransmit
2  the Channel.

3  16. The Widevine DRM and the copy protection that it affords is circumvented using a specially developed computer program that emulates the behavior of a reverse engineered hardware device. The computer program tricks Sling's Widevine DRM server to grant access and provide a channel decryption key by making the server believe that the request originated from a legitimate Widevine supported device that would keep the channel decryption key secured (though in reality the request came from the computer program mimicking the reverse engineered hardware). The computer program uses the channel decryption key to unlock the encrypted audio-visual segments that make up the Channel and then compiles the segments to form an unencrypted Channel that is capable of being copied and retransmitted (as opposed to being merely viewed). The unencrypted Channel can be uploaded to a server outside of the Sling platform and retransmitted to any number of users that can receive the Channel without purchasing a legitimate subscription from Plaintiffs.

17. Upon information and belief, users of the Service can receive Plaintiffs' Channels because the Widevine DRM used to protect the Channels from unauthorized access and copying is being circumvented as described above. Additional content provided on the Service is believed to be acquired from other legitimate pay-television providers that use the Widevine DRM through this process of circumvention, which enables the Service to offer thousands of channels and on-demand programs for a small fraction of the cost charged by legitimate providers that pay to license their content such as Plaintiffs.

18. Sharma was notified that he must cease providing the Service because it infringes Plaintiffs' rights, but Sharma failed to comply. Sharma admitted that he will not stop providing the Service because the profits that Defendants receive from the Service are too good to stop: "By the time [Plaintiffs] try to do something, it will take years. Why lose out on the profit." Sharma also stated that he would attempt to place responsibility for the Service on his ex-wife: "If they contact me again, [I']ll just put it on my b**ch ex. I can tell them that she was running it under my name."

19. Sharma attempted to conceal Defendants' ongoing operation of the Service from Plaintiffs by instructing users to disguise their payments, for example telling them to not reference

"Sharma IPTV or IPTV anywhere" when paying for the Service and to instead reference something unrelated to the Service such as astrology consultation. Likewise, Sharma directed users to remove Google reviews that they posted for Defendants because the reviews connected Defendants to the Service. Sharma stated the reviews must be deleted as the Service "is not legal" and "dish or direct TV (referring to Plaintiff and pay-television provider DirecTV) "can give me and partners trouble."

20. Sharma also attempted to hide Defendants' continued operation of the Service from Plaintiffs by limiting how the Service was sold to users. For example, Defendants stopped accepting PayPal payments because "Dish and some other companies have been catching people" and instead directed users of the Service to pay by other means, most recently instructing users to send payment through a U.K.-based payment processor to an individual located abroad. Defendants also have a policy to not sell the Service to users with a Colorado address (where Plaintiffs are notably located). Plaintiffs, however, purchased the Service from Defendants through undercover investigators and through expert analysis have shown that the Service is circumventing Plaintiffs' DRM technology and retransmitting Plaintiffs' Channels without authorization.

## CLAIMS FOR RELIEF

## COUNT I

### Violations of the DMCA, 17 U.S.C. § 1201(a)(2)

21. Plaintiffs repeat and reallege the allegations in paragraphs 1-20.

22. Plaintiffs use DRM technology to effectively control access to their Channels that include works that are protected under Title 17, United States Code. Plaintiffs are authorized by the copyright owners to control access to the Channels and implement the DRM technology with their consent.

23. Plaintiffs' DRM technology is circumvented to gain access to Plaintiffs' Channels that are retransmitted without authorization to users of the Service. Upon information and belief, the circumvention targets Plaintiffs' Widevine DRM and represents an essential component or part of the Service.

24. The Service, or at least the component or part of the Service that involves gaining unauthorized access to Plaintiffs' Channels, is primarily designed and produced for the purpose of

1  circumventing the DRM technology that Plaintiffs implement and has no commercially significant
2  purpose or use other than circumventing such DRM technology.

3        25.     Defendants violate 17 U.S.C. § 1201(a)(2) by manufacturing, offering to the public,
4  providing, or otherwise trafficking in the Service. Each sale of the Service constitutes a separate
5  violation of 17 U.S.C. § 1201(a)(2).

6        26.     Defendants' actions violating 17 U.S.C. § 1201(a)(2) were performed without the
7  authorization or consent of Plaintiffs or, upon information and belief, any owner of the copyrighted
8  works provided by Plaintiffs.

9        27.     Defendants' violations of 17 U.S.C. § 1201(a)(2) were willful. Such violations have
10 damaged Plaintiffs in an amount to be proven at trial. Unless restrained and enjoined, Defendants
11 will continue to violate 17 U.S.C. § 1201(a)(2).

## COUNT II

### Violations of the DMCA, 17 U.S.C. § 1201(b)(1)

14       28.     Plaintiffs repeat and reallege the allegations in paragraphs 1-20.

15       29.     Plaintiffs use DRM technology to effectively control copying of their Channels that
16 include works that are protected under Title 17, United States Code. Plaintiffs are authorized by the
17 copyright owners to control copying of the Channels, including distribution and public performance
18 through acts of retransmission, and implement the DRM technology with their consent.

19       30.     Plaintiffs' Channels are retransmitted without authorization to users of the Service
20 by circumventing the protection afforded by Plaintiffs' DRM technology. Upon information and
21 belief, the circumvention targets Plaintiffs' Widevine DRM and represents an essential component
22 or part of the Service.

23       31.     The Service, or at least the component or part of the Service involving unauthorized
24 copying of Plaintiffs' Channels by retransmitting them to users of the Service, is primarily designed
25 and produced for purposes of circumventing the protection afforded by Plaintiffs' DRM technology
26 and has no commercially significant purpose or use other than circumventing such protection.

27       32.     Defendants violate 17 U.S.C. § 1201(b)(1) by manufacturing, offering to the public,
28 providing, or otherwise trafficking in the Service. Each sale of the Service constitutes a separate

1  violation of 17 U.S.C. § 1201(b)(1).

2  33. Defendants' actions violating 17 U.S.C. § 1201(b)(1) were performed without the
3  authorization or consent of Plaintiffs or, upon information and belief, any owner of the copyrighted
4  works provided by Plaintiffs.

5  34. Defendants' violations of 17 U.S.C. § 1201(b)(1) were willful. Such violations have
6  damaged Plaintiffs in an amount to be proven at trial. Unless restrained and enjoined, Defendants
7  will continue to violate 17 U.S.C. § 1201(b)(1).

**PRAYER FOR RELIEF**

Plaintiffs request a judgment against Defendants as follows:

A. For a permanent injunction, as authorized by 17 U.S.C. § 1203(b)(1), that prohibits Defendants, and any officer, agent, servant, employee, or other person acting in active concert or participation with them that receives actual notice of the order, from manufacturing, offering to the public, providing, or otherwise trafficking in the Service, or any other technology, product, service, device, component, or part thereof that:

   1. is primarily designed or produced for circumventing any DRM technology or other technological measure that Plaintiffs use to control access to or protect against copying of a copyrighted work;

   2. has at best only limited commercially significant purpose or use other than circumventing any DRM technology or other technological measure that Plaintiffs use to control access to or protect against copying of a copyrighted work; or

   3. is marketed for circumventing any DRM technology or other technological measure that Plaintiffs use to control access to or protect against copying of a copyrighted work.

B. For an order awarding the greater of: (1) Plaintiffs' actual damages together with Defendants' profits that are attributable to the violations identified in Count I and Count II, or (2) statutory damages up to $2,500 for each violation identified in Count I or Court II, pursuant to 17 U.S.C. § 1203(c)(2) and (c)(3)(A);

C. For an order awarding Plaintiffs their attorneys' fees and costs under 17 U.S.C. § 1203(b)(4)-(5);

     D.     For an accounting of all profits and other benefits that Defendants received from the wrongful conduct identified in this complaint;

     E.     For pre and post-judgment interest on all damages awarded by the Court, from the earliest date permitted by law at the maximum rate permitted by law; and

     F.     For such additional relief as the Court deems just and equitable.

Dated: February 16, 2024

Respectfully submitted,

*/s/ Timothy M. Frank*
Timothy M. Frank (California Bar No. 263245)
timothy.frank@hnbllc.com
HAGAN NOLL & BOYLE LLC
820 Gessner, Suite 940
Houston, Texas 77024
Telephone: (713) 343-0478
Facsimile: (713) 758-0146

Attorney for Plaintiffs DISH Network L.L.C. and Sling TV L.L.C.