Timothy M. Frank (California Bar No. 263245)
timothy.frank@hnbllc.com
HAGAN NOLL & BOYLE LLC
820 Gessner, Suite 940
Houston, Texas 77024
Telephone: (713) 343-0478
Facsimile: (713) 758-0146

Attorney for Plaintiffs DISH Network L.L.C.
and Sling TV L.L.C.

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN FRANCISCO DIVISION

| | |
|---|---|
| DISH NETWORK L.L.C. and SLING TV L.L.C., <br><br> Plaintiffs, <br><br> v. <br><br> VANEET SHARMA and ASTRO VASTU SOLUTIONS LLC, <br><br> Defendants. | Case No. 3:24-cv-00961-JSC <br><br> **PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** <br><br> Judge: Hon. Jacqueline Scott Corley <br> Date: March 28, 2024 <br> Time: 10:00 a.m. |

**Table of Contents**

I.  Notice ...................................................................................................................................1

II. Issues ....................................................................................................................................1

III. Introduction ..........................................................................................................................2

IV. Facts .....................................................................................................................................3

    A.  Plaintiffs Provide Secured Transmissions Of Copyrighted Programming ...............3

    B.  Defendants Traffic In A Service That Circumvents Plaintiffs' Security ..................3

    C.  Defendants Admitted And Attempted to Cover Up Their Infringement .................5

V. Argument ..............................................................................................................................7

    A.  Defendants Should Be Enjoined From Providing The Service ................................7

        1.  Plaintiffs Are Likely To Succeed On The Merits Of Their DMCA Claims ........................................................................................................................7

        2.  Plaintiffs Are Likely To Suffer Irreparable Harm Absent An Injunction .....9

        3.  The Balance Of Equities And Public Interest Favor An Injunction ...........11

    B.  Plaintiffs Should Not Be Required To Post Bond ..................................................12

    C.  Defendants Assets Should Be Frozen .....................................................................12

VI. Conclusion .........................................................................................................................15

**Table of Authorities**

*Alliance for the Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) .................................................................................................. 7

*Apple Inc. v. Psystar Corp.*,
   673 F. Supp. 2d 943 (N.D. Cal. 2009) .................................................................................... 11

*AT&T Broadband v. Tech Commc'n, Inc.*,
   381 F.3d 1309 (11th Cir. 2004) .............................................................................................. 14

*Cadence Design Sys., Inc. v. Avant! Corp.*,
   125 F.3d 824 (9th Cir. 1997) .................................................................................................. 11

*Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*,
   766 F.2d 1316 (9th Cir. 1985) .................................................................................................. 9

*Cisco Sys., Inc. v. Shenzhen Usource Tech. Co*,
   No. 5:20-cv-04773-EJD, 2020 WL 4196273 (N.D. Cal. July 20, 2020) .................... 12, 15

*Conn. Gen. Life. Ins. Co. v. New Images of Beverly Hills*,
   321 F.3d 878 (9th Cir. 2003) .................................................................................................. 12

*CSC Holdings, Inc. v. Redisi*,
   309 F.3d 988 (7th Cir. 2002) .................................................................................................. 13

*Datatech Enters. LLC v. FF Magnant Ltd.*,
   No. C 12-04500 CRB, 2012 WL 4068624 (N.D. Cal. Sept. 14, 2012) ............................ 13

*Davidson & Assoc. v. Jung*,
   422 F.3d 630 (8th Cir. 2005) .................................................................................................... 9

*DISH Network L.L.C. v. Barcan*,
   No. 4:21-cv-2384 (S.D. Tex. Aug. 11, 2023) ......................................................................... 9

*DISH Network L.L.C. v. Dillion*,
   No. 12CV157 BTM (NLS), 2012 WL 368214 (S.D. Cal. Feb. 3, 2012) .................... 10-12

*DISH Network L.L.C. v. Droid Tech.*,
   No. 8:19-cv-672-T-02AEP (M.D. Fla. Mar. 20, 2019) ...................................................... 15

*DISH Network L.L.C. v. Ramirez*,

No. 15-cv-04712-BLF, 2016 WL 3092184 (N.D. Cal. June 2, 2016) ............................. 10

*DISH Network L.L.C. v. SET Broadcast LLC*,

No. 8:18-cv-01332-T-33AAS (M.D. Fla. June 4, 2018) .................................................. 15

*DISH Network L.L.C. v. Whitcomb*,

No. 11-CV-0333 W(RBB), 2011 WL 1559825 (S.D. Cal. Apr. 25, 2011) ................ 10-12

*eBay, Inc. v. Bidder's Edge, Inc.*,

100 F. Supp. 2d 1058 (N.D. Cal. 2000) ............................................................................ 9

*Fed. Trade Comm'n v. Kutzner*,

No. CV 16-00999-BRO (AFMx), 2016 WL 11811746 (C.D. Cal. Nov. 7, 2016) .......... 14

*Henry Schein, Inc. v. Cook*,

191 F. Supp. 3d 1072 (N.D. Cal. 2016) .......................................................................... 10

*Johnson v. Couturier*,

572 F.3d 1067 (9th Cir. 2009) ................................................................................... 12-13

*Jorgensen v. Cassiday*,

320 F.3d 906 (9th Cir. 2003) .......................................................................................... 12

*Niantic, Inc. v. Global++*,

No. 19-cv-03425-JST, 2019 WL 8333451 (N.D. Cal. Sept. 26, 2019) ........................... 12

*Porter v. Warner Holding Co.*,

328 U.S. 395 (1941) ........................................................................................................ 14

*Realnetworks, Inc. v. DVD Copy Control Ass'n*,

641 F. Supp. 2d 913 (N.D. Cal. 2009) .............................................................................. 8

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,

970 F.2d 552 (9th Cir. 1992) ..................................................................................... 12-13

*Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*,

944 F.2d 597 (9th Cir. 1991) ............................................................................................ 9

*Sec. & Exch. Comm'n v. Liu*,

851 F. App'x 665 (9th Cir. 2021) ................................................................................... 13

*Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*,

240 F.3d 832 (9th Cir. 2001) .................................................................................. 10

*TKR Cable Co. v. Cable City Corp.*,

267 F.3d 196 (3d Cir. 2001) .................................................................................... 14

*Triad Sys. Corp. v. Se. Express Co.*,

64 F.3d 1330 (9th Cir. 1995) .................................................................................... 11

*Winter v. Natural Res. Def. Council, Inc.*,

555 U.S. 7 (2008) ................................................................................................ 7, 10

*WPIX, Inc. v. ivi, Inc.*,

691 F.3d 275 (2d Cir. 2012) .................................................................................... 11

**Rules**

Fed. R. Civ. P. 65 ............................................................................................... 1, 7, 12

**Statutes**

17 U.S.C. § 1201 .................................................................................................. 1, 7-9

17 U.S.C. § 1203 ............................................................................................. 1, 7, 13-14

Plaintiffs' Motion for Preliminary Injunction
v
Case No. 3:24-cv-00961-JSC

## I.   NOTICE

Plaintiffs DISH Network L.L.C. and Sling TV L.L.C.'s motion for preliminary injunction against Defendants Vaneet Sharma and Astro Vastu Solutions LLC is noticed for hearing on March 28, 2024, at 10:00 a.m., or as soon as this matter may be heard before the Honorable Jacqueline Scott Corley in the United States District Court for the Northern District of California, Courtroom 8, located at 450 Golden Gate Ave., San Francisco, California 94102.

Defendants are violating the Digital Millennium Copyright, 17 U.S.C. §§ 1201(a)(2), (b)(1) ("DMCA"), by trafficking in an internet streaming service known as Sharma IPTV (the "Service") that circumvents Plaintiffs' security measures to gain unauthorized access to Plaintiffs' television channels and then retransmits Plaintiffs' channels, without authorization, to users that purchase the Service from Defendants. Pursuant to Federal Rule of Civil Procedure 65 and the DMCA, 17 U.S.C. § 1203(b)(1), Plaintiffs move to preliminarily enjoin Defendants from trafficking in the Service and freeze Defendants' assets to preserve the funds wrongfully acquired from this infringing activity.

## II.   ISSUES

1. Whether <u>Defendants should be preliminarily enjoined</u> from trafficking in the Service, which requires consideration of four factors: (1) whether Plaintiffs have a likelihood of success on the merits of their DMCA claims based on testimony of Plaintiffs' expert witnesses showing that Plaintiffs' security measures and their corresponding protections were circumvented to access and retransmit Plaintiffs' channels on the Service; (2) whether Plaintiffs have established a likelihood of irreparable harm in the form of hard-to-calculate lost subscription revenues and damage to their business reputations; (3) whether the harm to Plaintiffs is outweighed by any cognizable harm that Defendants may suffer if enjoined from trafficking in the Service that infringes Plaintiffs' rights; and (4) whether the public interest is served by enjoining Defendants from providing the Service.

2. Whether <u>Defendants' assets should be frozen</u> because either (1) a freeze is appropriate to preserve Plaintiffs' ability to recover equitable relief from Defendants in the form of disgorging their profits received from the Service; or (2) a freeze is appropriate to prevent Defendants from using their assets to fund new piracy operations while this action is pending.

### III.    INTRODUCTION

Defendant Vaneet Sharma ("Sharma") is trafficking in the illicit Service that bears his name and funneling the proceeds through his company, Defendant Astro Vastu Solutions LLC ("AVS"). Experts analyzed the Service and identified more than 100 instances where television channels that originated from Plaintiffs – two of the largest pay-television providers in the United States – were accessed and retransmitted without authorization to users of the Service. The security measures that protect Plaintiffs' channels from such unauthorized accessing and copying were circumvented to seed the Service with Plaintiffs' channels. In short, Plaintiffs' channels are being stolen and sold to users of the Service for Defendants' own financial gain (users that might have otherwise purchased a subscription from Plaintiffs to access these channels legitimately).

Defendants admitted to Plaintiffs' undercover investigator that their Service "is not legal" and for that reason Defendants have taken measures to hide their operation of the Service and the proceeds. Among other things, Defendants instruct users to lie about the nature of their payments to Defendants and never mention the Service; Defendants instruct users to send their payments to a person located abroad that is collecting money for them using an international payment processor; and Defendants refund users that they deem suspicious and have a policy to not sell the Service to any users with Colorado addresses (where Plaintiffs are located and in an effort to prevent Plaintiffs from discovering Defendants' infringement). Defendants undertook these measures to conceal their operation of the Service after receiving Plaintiffs' infringement notice and Sharma admitted that, if Plaintiffs contacted him again, he would falsely deny being responsible for the Service and instead attempt to "just put it on [his] b**ch ex" (referring to his ex-wife).

Defendants should be preliminarily enjoined from trafficking in the Service because these actions violate the DMCA, cause irreparable harm to Plaintiffs that exceeds any possible harm that an injunction might cause to Defendants, and the public interest is served by stopping Defendants from violating federal law and providing an infringing Service that has drawn numerous complaints from consumers, including customer service-related complaints that resulted in an F rating with at least one Better Business Bureau. Defendants' assets should also be frozen to preserve them, which is justified by Defendants' attempt to hide their operation of the Service from Plaintiffs, including

their use of a person abroad to funnel money through an international payment processor and keep the proceeds received from the Service beyond the reach of Plaintiffs.

### IV.   FACTS

**A.   Plaintiffs Provide Secured Transmissions Of Copyrighted Programming.**

Plaintiffs provide television programming to millions of authorized, fee-paying subscribers of their Sling TV and DISH Anywhere services by transmitting channels to them using the internet. (Gedeon Decl. ¶ 3.) Plaintiffs hold the distribution rights to provide the channels pursuant to license agreements between DISH and programming providers. (*Id*.) The programming aired on the channels is subject to copyright protections. (*Id*.)

Plaintiffs' channels, whether transmitted to Sling TV or DISH Anywhere subscribers, are delivered over the internet using the same Sling streaming platform (the "Channels"). (Duval Decl. ¶ 4.) Plaintiffs use digital rights management ("DRM") technology, described below, to protect the Channels from unauthorized access and copying. (Jones Decl. ¶ 9; Gedeon Decl. ¶ 3.)

**B.   Defendants Traffic In A Service That Circumvents Plaintiffs' Security.**

The Service is advertised on flyers distributed in Indian temples, restaurants, and shops in the Bay Area, which instruct users to contact Sharma by telephone or email to purchase the Service. (Remillard Decl. ¶ 4.) Sharma processes payments received from his sale of the Service through his company AVS, among others. (*Id*. ¶ 7.)




Defendants advertise the Service on their flyers as a subscription-based service providing more than 10,000 live channels, sports programs, movies, and pay-per-view events, among other

content, all for a low price ranging from approximately $10 to $15 per month. (Remillard Decl. ¶ 4.) Users can access the Service with their own hardware or purchase a set-top box from Defendants for an additional fee. (*Id.* ¶ 6.) Defendants' advertising places an emphasis on attracting users that may otherwise subscribe to legitimate pay-television services such as the satellite-based services provided by DISH, stating for example, "NO Cable/Dish Needed." (*Id.* ¶ 4.)

When purchasing the Service, Defendants provide users a portal URL to access the channels transmitted on the Service. (*Id.* ¶ 6.) Defendants activate and control access to the Service through the portal URL, as confirmed by Sharma's post-purchase statement: "Service started. All channels added." (*Id.* ¶ 6.) Defendants tout themselves as "the most sought IPTV service provider" because "[o]ur data centers are strategically located in Danville [where Defendants reside] and across the USA and Canada to bring the live streaming without any delay or freeze." (*Id.* ¶ 5.)

Plaintiffs' Channels are being retransmitted without authorization to users that purchase the Service from Defendants. (Jones Decl. ¶ 7; Duval Decl. ¶¶ 7-8.) Identifiers that are unique to Plaintiffs' Channels were detected when conducting a technical analysis of the corresponding channels on the Service, thereby confirming that channels retransmitted on the Service originated from Plaintiffs. (Jones Decl. ¶ 6; Duval Decl. ¶¶ 4-5.) Sling's logo was also observed on certain channels retransmitted on the Service, further demonstrating that Plaintiffs' Channels were used to seed the Service with this unauthorized content. (Jones Decl. ¶ 8; Duval Decl. ¶ 6, 8.)[1]

   

*NFL RedZone from Sling*        *NFL Redzone 4k from the Service*

---

[1] Jones's analysis was conducted using the portal URL http://4k.spicetv.cc and Duval's analysis was conducted using the portal URL http://smart4k.cc. (Jones Decl. ¶ 5; Duval Decl. ¶ 3.)

The Channels are retransmitted on the Service by circumventing the DRM technology that Plaintiffs use to protect their Channels from unauthorized access and copying. (Jones Decl. ¶ 12.) Upon information and belief, the circumvention targets the Widevine DRM. (*Id.*) The Widevine DRM controls access to Plaintiffs' Channels by requiring Plaintiffs' subscriber to present a valid digital authentication key and license request to Sling's Widevine DRM server to obtain the channel decryption key necessary to unlock a specific Channel. (*Id.* ¶ 10a-d.) The channel decryption key is provided to Plaintiffs' subscriber in an encrypted communication and upon receipt is not exposed to the subscriber but rather is secured in the content decryption module of the subscriber's Widevine supported device. (*Id.* ¶ 10d.) In addition, the Widevine DRM protects against copying of Plaintiffs' Channels by requiring that the encrypted audio-visual segments that make up a Channel are unlocked using the channel decryption key and complied to form the Channel within the confines of the content decryption module, such that Plaintiffs' subscriber can only view the Channel and not retransmit the Channel. (*Id.* ¶ 10e.)

The Widevine DRM and the copy protection it affords is circumvented using a specially developed computer program that emulates the behavior of a reverse engineered hardware device. (*Id.* ¶ 11a-b.) The computer program tricks Sling's Widevine DRM server to grant access and provide a channel decryption key by making the server believe the request originated from a legitimate Widevine supported device that would keep the channel decryption key secured (though in reality the request came from the computer program mimicking the reverse engineered hardware). (*Id.* ¶ 11c.) The computer program uses the channel decryption key to unlock the encrypted audio-visual segments that make up the Channel and then compiles the segments to form an unencrypted Channel that is capable of being copied and retransmitted (as opposed to being merely viewed). (*Id.* ¶ 11d.) The unencrypted Channel can be uploaded to a server outside of the Sling platform and retransmitted to any number of users that can receive the Channel without purchasing a legitimate subscription from Plaintiffs – as observed during the analysis conducted on the Service purchased from Defendants. (*Id.* ¶ 11e; Duval Decl. ¶¶ 7-8.)

**C.    Defendants Admitted And Attempted To Cover Up Their Infringement.**

Sharma was notified that he must cease providing the Service because it infringes Plaintiffs' rights, but Sharma failed to comply. (Remillard Decl. ¶ 9.) In fact, after receiving the notice, Sharma created a new website, sharmaiptv.com, to continue selling and profiting from the Service. (*Id.*) Sharma admitted that he will not stop providing the Service because the profits received from the Service are too good to stop, stating for example: "By the time [Plaintiffs] try to do something, it will take years. Why lose out on the profit." (*Id.* ¶ 10a.) Sharma also stated that he will attempt to place responsibility for the Service on his ex-wife, stating: "If they contact me again, [I']ll just put it on my b\*\*ch ex. I can tell them that she was running it under my name." (*Id.* ¶ 10b.) After Sharma made these statements, Defendants continued to sell the Service and Plaintiffs' Channels continued to be retransmitted to users of the Service. (Timmermans Decl. ¶ 4; Jones Decl. ¶ _; Duval Decl. ¶¶ 7-8.)

Sharma attempted to conceal Defendants' ongoing operation of the Service from Plaintiffs by instructing users to disguise their payments, for example telling them to not reference "Sharma IPTV or IPTV anywhere" when paying for the Service and to instead reference something unrelated to the Service such as astrology consultation. (Arguello Decl. ¶ 4; Timmermans Decl. ¶ 8; Remillard Decl. ¶ 11a.) Likewise, Sharma instructed users to remove Google reviews that they provided for Defendants concerning the Service. (Timmermans Decl. ¶ 6; Remillard Decl. ¶ 11b.) Sharma stated that he wanted the reviews deleted because the Service "<u>is not legal</u>" and "dish or direct TV (referring to Plaintiff and pay-television provider DirecTV) "can give me and partners trouble." (*Id.* [emphasis added].)

Sharma also attempted to conceal Defendants' ongoing operation of the Service by limiting how the Service was sold to users. For example, Defendants stopped accepting PayPal payments because "Dish and some other companies have been catching people" and instead directed Service users to send payment by other means, most recently instructing users to send payment through a U.K.-based payment processor to an individual located abroad. (Timmermans Decl. ¶¶ 9-10; Remillard Decl. ¶ 11d.) Defendants also have a policy to not sell the Service to users with a Colorado address (where Plaintiffs are located), or to users that are not of Indian descent. (Remillard Decl. ¶ 11c.) Plaintiffs, however, purchased the Service through undercover investigators and

through expert analysis have shown that the Service is circumventing Plaintiffs' DRM technology and retransmitting Plaintiffs' Channels without authorization.

## V.   ARGUMENT

### A.   Defendants Should be Enjoined From Providing The Service.

The federal statute under which Plaintiffs initiated this action, the DMCA, authorizes the Court to "grant temporary and permanent injunctions on such terms as it may deem reasonable to prevent or restrain violations." 17 U.S.C. § 1203(b)(1); *see also* Fed. R. Civ. P. 65(a). Plaintiffs are entitled to a preliminary injunction by showing that: (1) they are "likely to succeed on the merits;" (2) they are "likely to suffer irreparable harm in the absence of preliminary relief;" (3) "the balance of equities tips in [their] favor;" and (4) "an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The Ninth Circuit follows a "sliding scale" approach to these factors, such that Plaintiffs need only present "serious questions going to the merits" if the balance of equities "tips sharply" in their favor and the remaining two factors are met. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

### 1.   Plaintiffs Are Likely To Succeed On The Merits Of Their DMCA Claims.

Defendants violate the DMCA's two anti-trafficking provisions by providing the Service. The first, section 1201(a)(2), makes it unlawful for any person to "offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof" that (1) "is primarily designed or produced for the purpose of circumventing a technological measure that effectively controls access to a [copyright protected] work;" or (2) "has only limited commercially significant purpose or use other than to circumvent [such] a technological measure" 17 U.S.C. § 1201(a)(2). "[T]o 'circumvent a technological measure' means to descramble a scrambled work, to decrypt an encrypted work, or to otherwise avoid, bypass, remove, deactivate, or impair a technological measure, without the authority of the copyright owner." *Id.* § 1201(a)(3)(A). "[A] technological measure 'effectively controls access to a work' if the measure, in the ordinary course of its operation, requires the application of information, or a process or a treatment, with the authority of the copyright owner, to gain access to the work." *Id.* § 1201(a)(3)(B).

The second provision, section 1201(b)(1), makes it unlawful for any person to "offer to the public, provide, or otherwise traffic in any technology, product, service, device, component, or part thereof" that (1) "is primarily designed or produced for the purpose of circumventing protection afforded by a technological measure that effectively protects a right of a copyright owner;" or (2) "has only limited commercially significant purpose or use other than to circumvent protection afforded by [such] a technological measure." *Id.* § 1201(b)(1). "[T]o 'circumvent protection afforded by a technological measure' means avoiding, bypassing, removing, deactivating, or otherwise impairing a technological measure." *Id.* § 1201(b)(2)(A). "[A] technological measure 'effectively protects a right of a copyright owner under this title' if the measure, in the ordinary course of its operation, prevents, restricts, or otherwise limits the exercise of a right of a copyright owner." *Id.* § 1201(b)(2)(B).

The Widevine DRM is an effective technological measure under section 1201(a)(2) because in the ordinary course of its operation the DRM controls access to Plaintiffs' Channels using a key-based subscriber authentication and encryption-decryption process. (Jones Decl. ¶ 10.) *See* 17 U.S.C. § 1201(a)(3)(B); *Realnetworks, Inc. v. DVD Copy Control Ass'n*, 641 F. Supp. 2d 913, 919-920, 933 (N.D. Cal. 2009) (finding encryption technology protecting DVDs using a key-based algorithm was an effective access control measure under the DMCA). Plaintiffs' Channels are retransmitted to users of the Service by circumventing the access control feature of the Widevine DRM because, through the computer program that tricks the Sling Widevine DRM server to grant access to the channel decryption key, Plaintiffs' Channels are decrypted without authorization. (Jones Decl. ¶ 11.) *See* 17 U.S.C. § 1201(a)(3)(A).

The Widevine DRM is also an effective technological measure for the purpose of section 1201(b)(1) because in the ordinary course of its operation the DRM prevents, restricts, or otherwise limits copying of Plaintiffs' Channels (e.g., distribution and public performance of the Channels by retransmission). (*Id.* ¶ 10.) *See* 17 U.S.C. § 1201(b)(2)(B). Plaintiffs' Channels are retransmitted to Service users by circumventing the copy control feature of the Widevine DRM because, through the computer program that uses the channel decryption key to unlock and compile each Channel, the Channels are distributed to servers outside the Sling platform, where the Channels are publicly

performed to users of the Service that access them without having a legitimate subscription from Plaintiffs. (*Id.* ¶ 11.) *See* 17 U.S.C. § 1201(b)(2)(A).

The process of acquiring channels for the Service is an essential component or part of the Service because without content there would be no Service. (Jones Decl. ¶ 12; *see also* Remillard Decl. ¶ 4.) Plaintiffs' Channels are accessed and retransmitted to users of the Service by circumventing Plaintiffs' DRM technology and its corresponding protections. (*Id.*) Accordingly, the Service, or at least the components or parts of the Service that involve accessing and retransmitting Plaintiffs' Channels to users of the Service, is primarily designed and produced for the purpose of circumventing the DRM technology implemented by Plaintiffs and the protections afforded by such technology, and has no other commercially significant purpose or use. (*Id.*) Defendants violated the DMCA because they "offer to the public, provide, and otherwise traffic in" the Service. 17 U.S.C. §§ 1201(a)(2), (b)(1).

Accordingly, there is substantial likelihood that Plaintiffs will prevail on the merits of their DMCA anti-trafficking claims. *See Davidson & Assoc. v. Jung*, 422 F.3d 630, 641 (8th Cir. 2005) (affirming liability on section 1201(a)(2) claim where defendants trafficked in a service that was developed by circumventing plaintiffs' security technology and then provided that service to users to enable unauthorized access to plaintiffs' copyrighted computer games); *see also DISH Network L.L.C. v. Barcan*, No. 4:21-cv-2384, Doc. 33 (S.D. Tex. Aug. 11, 2023) (entering judgment against streaming service operators for violations of section 1201(a)(2) where the service offered Plaintiffs' programming that was obtained by circumventing DRMs) (attached to Frank Decl. as Exhibit 1).

**2.     Plaintiffs Are Likely To Suffer Irreparable Harm Absent An Injunction.**

The Ninth Circuit recognizes that loss of goodwill, loss of control over business reputation, and loss of profits each constitute irreparable harm. *See Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm"); *eBay, Inc. v. Bidder's Edge, Inc.*, 100 F. Supp. 2d 1058, 1066 (N.D. Cal. 2000) ("Harm resulting from lost profits and lost customer goodwill is irreparable . . . .") (citing *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency,* 766 F.2d 1316, 1319 (9th Cir. 1985)). Plaintiffs must only show they are "likely to suffer

irreparable harm" and therefore "evidence of threatened loss of prospective customers or goodwill" is sufficient. *Winter*, 555 U.S. at 20; *Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) (citing *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 841 (9th Cir. 2001)). Defendants, by trafficking in the Service, are likely to cause irreparable harm to Plaintiffs for at least two reasons.

<u>First</u>, Plaintiffs are losing revenue because Defendants assist their Service users to receive Plaintiffs' Channels without paying a subscription fee to Plaintiffs. (Gedeon Decl. ¶ 4.) Quantifying Plaintiffs' lost revenue is impractical as the number of Defendants' users that received Plaintiffs' Channels without authorization through the Service, and otherwise would have properly purchased a subscription to those Channels through Plaintiffs, is not easily determined. (*Id.*) Absent an injunction, Defendants will continue facilitating users of the Service to receive Plaintiffs' Channels without authorization. *See supra* Part IV.C. Thus, Plaintiffs are likely to suffer irreparable harm if Defendants are not enjoined from trafficking in the Service. *See DISH Network L.L.C. v. Ramirez*, No. 15-cv-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016) (finding irreparable harm due in part to the difficultly in quantifying DISH's lost revenue resulting from the distribution of piracy devices); *DISH Network L.L.C. v. Dillion*, No. 12CV157 BTM (NLS), 2012 WL 368214, at *4 (S.D. Cal. Feb. 3, 2012) (finding irreparable harm in similar case because "[i]t would be very difficult to quantify Plaintiffs' lost revenue"); *DISH Network L.L.C. v. Whitcomb*, No. 11-CV-0333 W(RBB), 2011 WL 1559825, at *3 (S.D. Cal. Apr. 25, 2011) (finding lost profits and subscribers resulting from the sale of piracy devices constitutes irreparable harm).

<u>Second</u>, Defendants harm Plaintiffs' business reputations and goodwill, which are built on and depend on delivering television programming to authorized subscribers in a secure manner. (Gedeon Decl. ¶ 5.) Defendants assist their Service users in receiving Plaintiffs' Channels without authorization and thereby harm Plaintiffs' reputations and interfere with Plaintiffs' contractual and prospective business relationships, including relationships with programming providers that license the Channels. (*Id.*) Calculating Plaintiffs' reputational harm is inherently difficult, if not impossible. (*Id.*) Defendants will continue with their conduct that harms Plaintiffs' reputations and goodwill if not enjoined. *See supra* Part IV.C. For this additional reason, Plaintiffs have shown a likelihood of

irreparable harm if Defendants are not enjoined from trafficking in the Service. *See Apple Inc. v. Psystar Corp.*, 673 F. Supp. 2d 943, 949 (N.D. Cal. 2009) (finding damage to plaintiff's reputation and goodwill sufficient to establish irreparable harm in DMCA action); *Dillion*, 2012 WL 368214, at *4 (finding irreparable harm in part because "piracy harms the reputation of Plaintiffs" and "[i]t would be very difficult to quantify Plaintiffs'. . . reputational damage and make Plaintiffs whole").

### 3. The Balance Of Equities And Public Interest Favor An Injunction.

Plaintiffs will be irreparably harmed absent an injunction for the reasons set forth above. In contrast, an injunction will only cause Defendants to cease profiting from their sale of the Service – which Defendants acknowledge "is not legal" – and therefore Defendants' interest in continuing to sell the Service should not be given any weight in the balancing of equities. *See supra* Part IV.C; *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 829 (9th Cir. 1997) (finding profits lost from enjoined sale of infringing goods is not cognizable harm); *Triad Sys. Corp. v. Se. Express Co.*, 64 F.3d 1330, 1338 (9th Cir. 1995) ("Where the only hardship that the defendant will suffer is lost profits from an activity which has been shown likely to be infringing, such an argument in defense merits little equitable consideration . . . .").

Likewise, the public interest is best served by enjoining acts that violate federal law such as the DMCA. *See Psystar*, 673 F. Supp. 2d at 950 (holding public interest is promoted by enjoining conduct that violates the DMCA); *Whitcomb*, 2011 WL 1559825, at *4 ("The public has a strong interest in enforcing anti-piracy legislation, such as the DMCA."); *see also WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287-88 (2d Cir. 2012) (finding public interest is supported by enjoining unauthorized streaming of television programming, as public could still access that programming through lawful services). Moreover, the public interest benefits by preventing Defendants from selling the Service because they have drawn numerous complaints from consumers, including customer service-related complaints that resulted in an F rating with at least one Better Business Bureau. (Remillard Decl. ¶ 8.)[2] The four requirements for entering a preliminary injunction are therefore satisfied.

---

[2] Sharma, in an attempt to distance Defendants from the Service, also threatened to report users of the Service to the police because they posted Google reviews for Defendants regarding the Service – reviews that Sharma himself asked the Service users to provide. (Timmermans Decl. ¶ 6.)

**B.     Plaintiffs Should Not Be Required To Post Bond.**

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined . . . ." Fed. R. Civ. P. 65(c). "Rule 65(c) invests the district court with discretion as to the amount of security required, *if any*." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003) (quotations omitted). "[T]he bond amount may be zero if there is no evidence the party will suffer damages from the injunction." *Conn. Gen. Life. Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (citations omitted); *see also Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("[T]he district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct.") (quotations omitted). Here, Defendants have no legitimate interest that will be harmed by requiring them to cease trafficking in the Service in violation of the DMCA. Thus, bond should be set at zero. *See Cisco Sys., Inc. v. Shenzhen Usource Tech. Co.*, No. 5:20-cv-04773-EJD, 2020 WL 4196273, at *13 (N.D. Cal. July 20, 2020) (issuing TRO and setting bond at zero where there was clear evidence of defendants' infringement); *Niantic, Inc. v. Global++*, No. 19-cv-03425-JST, 2019 WL 8333451, at *9 (N.D. Cal. Sept. 26, 2019) (granting preliminary injunction and setting bond at zero); *Dillion*, 2012 WL 368214, at *6 (same); *Whitcomb*, 2011 WL 1559825, at *4 (same).

**C.     Defendants' Assets Should Be Frozen.**

Defendants assets should be frozen for two reasons: *first*, to preserve Plaintiffs' equitable remedy of disgorging the profits that Defendants received from the Service; and *second*, to prevent Defendants from funding new piracy operations while this action is pending. The Court's authority to enter an asset freeze for each of these reasons is firmly established and the circumstances in this case justify the Court exercising that authority to freeze Defendants' assets.

The Ninth Circuit has held that an asset freeze is appropriate in the preliminary injunction context to preserve a plaintiff's right to final equitable relief, which includes the disgorgement of a defendant's profits. *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 559-60 (9th Cir. 1992) (affirming district court's asset freeze entered in trademark infringement case under Lanham Act). Similar to the federal statute at issue in *Reebok*, the DMCA expressly authorizes Plaintiffs to

recover the profits that Defendants received from their sale of the Service as damages. 17 U.S.C. § 1203(c)(2) (allowing recovery of "profits of the violator"). Thus, the Court is authorized to freeze Defendants' assets to preserve Plaintiffs' right to recover such profits. *Reebok*, 970 F.2d at 559-60; *Sec. & Exch. Comm'n v. Liu*, 851 F. App'x 665, 668-69 (9th Cir. 2021) (affirming asset freeze to preserve disgorgement of profits remedy); *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 996 (7th Cir. 2002) ("Since the assets in question here were profits [defendants] made by unlawfully stealing [plaintiff's television] services, the freeze was appropriate and may remain in place pending final disposition of the case.").

The Court should exercise its authority to freeze Defendants' assets as there is "a likelihood of dissipation of the claimed assets, or other inability to recover monetary damages, if the relief is not granted." *Couturier*, 572 F.3d at 1085. Defendants have already taken measures to conceal from Plaintiffs their continued operation of the Service and the profits received from the Service. Among other things, Defendants instructed users to lie about the nature of their payments to Defendants so those payments could not be used to establish Defendants' sale of the Service; Defendants advised users to delete evidence of prior sales of the Service in the form of Google reviews that users posted for Defendants; and Defendants stopped using a United States-based payment processor, PayPal, because "Dish and some other companies have been catching people" and rather Defendants started instructing users to send payment to a person located abroad that is collecting money for Defendants using an international payment processor. *See supra* Part IV.C. Sharma also admitted that he would be dishonest if confronted by Plaintiffs and attempt to place the blame on his former spouse. *Id.*

Defendants' various efforts to disguise the payments they received from selling the Service, coupled with their diversion of such payments outside of the United States and Sharma's admitted plan to be dishonest when caught – all undertaken to frustrate Plaintiffs' ability to pursue this case – justifies an order freezing Defendants' assets. *Couturier*, 572 F.3d at 1085 (affirming asset freeze and finding defendant "presumably more than capable of placing assets in his personal possession beyond the reach of a judgment" where defendant persuaded others to divert business funds into an unrelated account); *Datatech Enters. LLC v. FF Magnant Ltd.*, No. C 12-04500 CRB, 2012 WL 4068624, at *5 (N.D. Cal. Sept. 14, 2012) (finding defendants' efforts to transition to international

payment processors after being notified of the suit supported a likelihood of asset dissipation); *Fed. Trade Comm'n v. Kutzner*, No. CV 16-00999-BRO (AFMx), 2016 WL 11811746, at *8-9 (C.D. Cal. Nov. 7, 2016) (finding defendant's dishonesty in reporting financial information evidenced he was likely to conceal or dissipate his assets)[3].

There is also a second justification for freezing Defendants' assets: to prevent Defendants from funding new piracy operations while this case is pending. The DMCA authorizes the Court to "grant temporary and permanent injunctions on such terms as it deems reasonable to prevent or restrain a violation." 17 U.S.C. § 1203(b)(1). With this grant of express authority comes the inherent power to "decide whatever other issues and give whatever other relief may be necessary." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1941). The Court therefore has the equitable power to issue an asset freeze as a means of injunctive relief under the DMCA. *See AT&T Broadband v. Tech Commc'n, Inc.*, 381 F.3d 1309, 1316 (11th Cir. 2004) (applying *Porter* and finding district court had legal authority to enter an asset freeze in case involving pay-television piracy).

The Court should freeze Defendants' assets so those assets cannot be used to commit future DMCA violations. Defendants repeatedly expressed their intent to continue operating the Service, despite being notified the Service violates federal law. *See supra* Part IV.C. Freezing Defendants' assets will help to prevent Defendants from paying the costs necessary to continue operating the Service, or start up a new equivalent service that infringes Plaintiffs' rights, while this litigation is pending. *AT&T Broadband*, 381 F.3d at 1316 (affirming asset freeze issued to prevent defendant from using his "remaining assets to further other cable theft enterprises"); *TKR Cable Co. v. Cable City Corp.*, 267 F.3d 196, 208 n.4 (3d Cir. 2001) (affirming asset freeze in pay-television piracy case and observing such relief "is appropriate where it will assist the District Court in preventing defendants from committing further violations").

In sum, the Court should freeze Defendants' assets pending the outcome of this matter. The

---

[3] In addition to Sharma instructing users to lie about what they were purchasing from Defendants, e.g., astrology consultation rather than the Service, Sharma directed users to claim their payments were made for "Friends and Family" rather than "Goods and Services" so that Defendants can avoid paying taxes and fees associated with these payments. (Arguello Decl. ¶ 4; *see also* Timmermans Decl. ¶ 8 ["I don't want tax. PayPal is tax."].)

asset freeze can exclude funds that Defendants require to pay their legal fees in this action and other reasonable and necessary business and personal expenses, as approved by Plaintiffs or the Court. For the freeze to be effective, an accounting of Defendants' assets is also appropriate. *Cisco Sys.*, 2020 WL 4196273, at *15 (granting asset freeze and accounting of assets in trademark infringement action); *DISH Network L.L.C. v. Droid Tech*, No. 8:19-cv-672-T-02AEP, Docs. 7, 21 (M.D. Fla. Mar. 20, 2019) (granting asset freeze and accounting as part of TRO and preliminary injunction in case involving a similar scheme to steal DISH programming); *DISH Network L.L.C. v. SET Broadcast LLC*, No. 8:18-cv-01332-T-33AAS, Docs. 15, 63 (M.D. Fla. June 4, 2018) (same) (attached to Frank Decl. as Exhibits 2-3).

## VI.   CONCLUSION

The Court should grant Plaintiffs' motion for preliminary injunction to prevent Defendants from trafficking in the Service, which circumvents Plaintiffs' DRM technology and its associated protections against copying in order to retransmit Plaintiffs' Channels to users of the Service that are not authorized to receive these transmissions of Plaintiffs' Channels. Defendants' assets should also be frozen to preserve the funds they received from selling the Service to their users. The terms of Plaintiffs' proposed preliminary injunction and asset freeze are set forth in the concurrently filed proposed order and are narrowly tailored to protect Plaintiffs' rights in this case.

Dated: February 20, 2024                Respectfully submitted,

                                            */s/ Timothy M. Frank*
Timothy M. Frank (California Bar No. 263245)
timothy.frank@hnbllc.com
HAGAN NOLL & BOYLE LLC
820 Gessner, Suite 940
Houston, Texas 77024
Telephone: (713) 343-0478
Facsimile: (713) 758-0146

Attorney for Plaintiffs DISH Network L.L.C. and Sling TV L.L.C.